RAN WOOD v. STATE.

No. A-142.   Opinion Filed March 18, 1910.

(107 Pac. 937.)

1. **INDICTMENT AND INFORMATION—Prosecution of Felony by Information.** It is well settled in this state, that a person charged with a felony may be tried in a court having jurisdiction of such offense by information, having first had a preliminary examination before an examining magistrate, or having waived such preliminary examination.

2. **SAME—Allegation of Preliminary Examination.** It is not necessary for an information charging a felony to allege that defendant has had a preliminary examination before an officer authorized by law to hear the same, and has been bound over to await trial thereon, or has waived such examination.

3. **SAME—Surplusage.** A charge in an information that W., on the 4th day of April, 1908, had a preliminary examination on said charge before T., a duly elected, qualified, and acting magistrate of Roger Mills county, state of Oklahoma, and he, the said W., was by said T., on the 4th day of April 1908, committed and held in the common jail of said county and state to await the action of the district court on said above charge, is not in conflict with that portion of article 7, sec. 19, of the Constitution of the state, which provides, "All indictments, informations and complaints shall conclude 'Against the peace and dignity of the state,'" but is a matter wholly foreign and irrelevant to the information, and may be treated as surplusage.

4. **Jury—Challenge to Panel—Grounds.** A challenge to a petit jury panel must be predicated on facts from which defendant has suffered material prejudice.

5.    **SAME—Challenge to Panel—Sufficiency of Challenge.** While it is the duty of a trial court, when a challenge to a petit jury panel is presented to it, to try the issue of fact when the same is properly denied, yet it is not error for the court to overrule such challenge where it fails to state facts sufficient to justify the court in dischaging the jury, if true.

6.    **HOMICIDE — Manslaughter—Self-Defense—Provocation.** If W. provokes an altercation between himself and H., or challenges H. to a mutual combat, without intending to kill H., but intending an ordinary battery merely, and H. assaults W., or by some act done gave W. reasonable apprehension of loss of life or great bodily harm, and W. kills H. to protect himself from the apprehended danger, the killing under such circumstances would not be justifiable, but would be manslaughter.

7.    **APPEAL—Review—Argument of Counsel.** Remarks of counsel in the course of their arguments objected to as improper shall be considered and construed in reference to the evidence, and in order to constitute reversible error the impropriety induiged in must be such as to influence the verdict. Section 6957, Snyder's Comp. Laws, requires this court to "give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." The letter and spirit of the statute is that, if the court can say, after carefully considering the entire record, that the conviction is sufficiently supported by competent evidence, and that the verdict was not reached by error or as a result of passion and prejudice, the conviction should be affirmed.

(Syllabus by the Court.)

*Appeal from District Court, Roger Mills County; James R. Tolbert, Judge.*

Ran Wood was convicted of murder, and he appeals. Affirmed.

On the 9th day of June, 1908, W. H. Mouser, the duly qualified and acting county attorney of Roger Mills county, Okla., filed in the district court of said county his information, charging Ran Wood (who is hereinafter called defendant) with murder, which information, omitting the caption, is as follows:

"Comes now W. H. Mouser, county attorney for the said county of Roger Mills, in the name and by the authority of the state of Oklahoma, and information makes that one Ran Wood, late of the county aforesaid, on or about the 29th day of March, 1908, in the county of Roger Mills and state of Oklahoma, did then and there unlawfully, purposely, willfully, deliberately, ma-

liciously, feloniously, and of his deliberate and premeditated malice, and without authority of law, and with a premeditated design to effect the death of one Jesse Hungate, with a dangerous and deadly weapon, to wit, a pistol, then and there charged and loaded with gunpowder and leaden balls, which said pistol he, the said Ran Wood, then and there had and held in his hand, and with which said pistol so held and had, he, the said Ran Wood, did shoot the said leaden balls into the body and person of said Jesse Hungate, and so inflicted and so made a mortal wound in the body and person of the said Jesse Hungate, of which mortal wound, so inflicted and so made upon the said Jesse Hungate in manner and form and for the purpose aforesaid, he, the said Jesse Hungate, on and from the 29th day of March, 1908, until the 30th day of March, 1908, in the said county and state, did languish, and languishing did live, on which said 30th day of March, 1908, he, the said Jesse Hungate, in the town of Elk City, Beckham county, Okla., of the mortal wound aforesaid did die, as was intended by the said Ran Wood that he, the said Jesse Hungate, should do; and so the said Ran Wood in manner and form aforesaid did purposely, willfully, deliberately, maliciously, feloniously, and with malice aforethought, and without authority of law, and with a premeditated design to effect the death of the said Jesse Hungate, him, the said Jesse Hungate kill and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Oklahoma. The said defendant, Ran Wood, having on the 4th day of April, 1908, had a preliminary examination on said charge before E. E. Tracy, a duly elected, qualified, and acting examining magistrate of Roger Mills county and state of Oklahoma, and he, the said Ran Wood, was by said E. E. Tracy on the 4th day of April, 1908, ordered committed and held in the common jail of said county and state to await the action of the district court on said above charge. W. H. Mouser, County Attorney."

This information was properly subscribed and sworn to by one J. M. Evans, before W. P. Madden, clerk of the district court, on the 9th day of June, 1908. To this information the defendant filed his motion to set the same aside, which was by the court overruled, and the defendant reserved an exception. The defendant thereupon filed a demurrer to said information, which was also overruled by the court, to which ruling the defendant reserved an exception. On June 10th, 1908, defendant was duly

arraigned upon said information, and entered his plea of "Not guilty."

On September 21, 1908, defendant filed his challenge to the panel of jurors, which challenge, omitting caption, is as follows:

"Comes now the defendant in the above-entitled action and challenges the panel of the jury returned for service at this term of the court for material departures from the forms prescribed by law in respect to the selection, drawing, and return of the jury, from which the defendant has suffered material prejudice, and alleges: (1) That Joe Moad, one of the jury commissioners who selected the names from which this jury panel was made up, was at the time of selecting the names for use as jurors herein interested in this case, and was by law disqualified to act in respect to this case as jury commissioner. (2) That the said Joe Moad, one of said jury commissioners, lives in the immediate vicinity of the alleged offense charged against this defendant, and lived in said vicinity at the time of the alleged offense; that he from the first took a prominent and active part in the prosecution of the defendant herein; that he took part in employing Henry Furman as counsel to assist in the prosecution of this case, himself sending the telegram that brought the said Henry Furman to this county, and himself meeting the said Henry Furman at Elk City, Okla., and bringing him to the scene of the alleged offense with a view to his employment to prosecute in this case; that he, the said Joe Moad, jury commissioner as aforesaid, assisted the state by conference with the witnesses for the prosecution; that he, the said Joe Moad, took and kept a copy of the evidence adduced at said examining trial, as defendant is informed and believes, and has used same as a basis for further working up the case of the prosecution against this defendant; that afterward he acted as such jury commissioner, and on or about the 6th day of July, 1908, participated in selecting the names of jurymen from which this jury was made up. (3) That the said Joe Moad, acting as jury commissioner as aforesaid, assisted in selecting said jurymen for service in this court; having and taking an active and powerful interest in this prosecution; that the names selected by him were so selected with a view to a conviction in this case; that he, the said Joe Moad, was an influential member of said board of jury commissioners, and his selections were placed in the lists from which this jury was drawn; that by reason of the said Joe Moad's interest, the selection of the jurymen from

which this jury is made up was not, as to this defendant a fair and impartial jury list, and this panel contains names of jurors selected by the said Joe Moad with a view to the conviction of defendant in this case. Wherefore defendant prays that his challenge to said panel be allowed, and said jury be discharged as to this case. Gilkerson & Tracy, Attorneys for Defendant.

"Ran Wood, after being duly sworn according to law, upon his oath says that he is the defendant in the above-entitled cause; that he knows the contents of the above and foregoing challenge to the panel of jurors; that he knows of his own personal knowledge that the said Joe Moad is interested in this prosecution; that he is informed and verily believes that the extent of such interest is correctly stated in said challenge. R. T. Wood.

"Subcribed in my presence and sworn to before me on this 21st day of September, 1908. W. P. Madden, District Clerk, by W. C. Tyler, Deputy."

The record discloses that on the same day the above challenge was presented to the court the following proceedings in reference thereto were had:

By Counsel for the Plaintiff:

"The plaintiff denies each and every material allegation in the motion."

By Counsel for Defendant:

"We ask permission to furnish proof supporting the motion."

By the Court:

"I will hear proof if you have it."

The court at this time asked if the defendant had any proof to support their motion to suppress the panel of the petit jury.

By Counsel for Defendant:

"I think we have some proof present. We ask for subpœna on the jury commissioner Moad, who can be brought to testify, showing his interest in this case."

By the Court:

"It appearing to the court that the witness Moad is in Elk City, some 35 miles away, the court will refuse the request, but will hear any other evidence the defendant may have, but will not delay the case in order to hear this evidence. If counsel have no evidence present, the motion is overruled, and exceptions allowed."

Thereupon the defendant was placed on trial, and was on the 24th day of September, 1908, convicted of manslaughter in the first degree, and his punishment fixed by the jury at 16 years' imprisonment in the state penitentiary, at hard labor. On the same day defendant filed his motion for a new trial and arrest of judgment, which were by the court overruled, and defendant reserved an exception. Defendant thereupon waived two days' time to show cause why he should not receive sentence, and judgment was by the court pronounced and entered of record in accordance with the verdict of the jury.

W. F. Luttrell was the first witness for the state. He testified in substance that about 8 o'clock on the morning of the homicide the deceased came to his store. In about 15 minutes the defendant came, and each spoke to the other, saying "Good morning." In a short time the deceased stated, in the presence of defendant, that he believed that he would go up to Uncle Bill Lockhart's. Deceased then went out of the store, got on his horse, and rode away. In about 30 minutes he returned to the store, and purchased a pair of cuff buttons, and again went out, got on his horse, and rode off, going in the direction of his home. In a few seconds the defendant left the store, got on his horse, and started towards his home, which was the same direction from the store the deceased was going. At this time deceased was about 175 yards from the store. The deceased was riding (in what was termed by the witness) in a "saddle trot." Defendant was riding a part of the time in a saddle trot and in a lope, until he reached the deceased. They then rode 150 to 200 yards along by the side of each other, to where the deceased turned out into a road leading to a Mr. Ford's residence. This was about 100 yards from where the defendant would have had to turn in order to go to his father's house. The shooting took place about 700 yards from the store. After deceased had turned towards Ford's residence, defendant got off his horse, took a step to the east, and just as he did that drew his revolver and fired, and in three or four seconds deceased fired. Several shots were exchanged between deceased and defendant. Deceased remained on his horse during the

shooting. The witness also testified that deceased did not turn his horse from the direction in which it was going at the time the defendant dismounted from his horse and began shooting at the deceased. That he was standing in his storeroom looking out of a window in plain view of the deceased and defendant during all of this time.

George Lacy was the next witness for the state. He testified in substance that he was at Luttrell's store on the morning of the homicide; that he saw deceased leave the store, going in the direction of Bill Lockhart's; was there when he returned; saw him buy the cuff buttons; saw him leave; also the defendant; saw deceased and defendant riding along together for quite a distance, to where the deceased turned towards Ford's residence. Defendant then jumped off his horse, and defendant and deceased commenced shooting at each other. The first smoke witness saw was from defendant's gun; could not tell how long between first and second shots, but there was a longer time between the first and second shots than the others. Witness also testified that deceased did not stop or get off his horse during the shooting. On cross-examination witness corroborated the witness Luttrell as to how the deceased and the defendant were riding from the time they left the store until the homicide. Witness also testified that deceased did not turn his horse from the direction in which it was going, either before or after the shooting began.

W. A. Ford was the next witness for the state. He testified in substance that on the day of the homicide he was at home and heard some five or six shots. Looking out of the window of his residence, he saw the deceased and defendant about 50 yards away. Deceased was on his horse, galloping up to witness. Deceased got down off his horse, went into witness' house, and he and witness examined the wound. Deceased was shot near the hip bone. In about two minutes after the shooting the deceased made the following statement to the witness:

"He said he crossed the bridge, and he said the defendant overtook him and asked him why he drove so bad for his brother, and he said he told the defendant it was because his brother stole

his father's horse, and the defendant told him he did not know he had stole his horse, and the deceased told the defendant he knowed he did steal him, and the defendant said if you have got it in that bad, to get down and we will have it out here, and he said the defendant jumped off his horse, and as he turned around the defendant 'reached for his gun, and as he reached for his gun I reached for mine.' "

Dr. M. H. Levy, the next witness for the state, testified that the deceased was shot right above the edge of the hip bone on the right side, and passed obliquely through the abdomen, and the bullet lodged between the abdomen and the left side, causing peritonitis, which caused death.

Roy Whalen was the next witness for the state. He testified in substance that he was at Luttrell's store on the morning of the homicide. He was there at the time the deceased and defendant left. He saw what took place between them from the time they left the store until the shooting, and corroborated in every particular the testimony of Mr. Luttrell and Mr. Lacy.

Defendant undertook to establish by several witnesses that there were trees and shrubbery of different kinds between Luttrell's store and where the homicide took place, so as to obstruct the view of the eye-witnesses in such a manner as to prevent them from seeing the entire transaction.

Defendant took the stand in his own behalf; and, in view of his statements, we deem it immaterial to quote any of the testimony offered on his behalf other than his own. He testified in substance that he met the deceased on the morning of the homicide between 8 and 9 o'clock at Luttrell's store. He admitted that he was there when the deceased left to go to Lockhart's. He was there when he returned and purchased the cuff buttons, as testified to by the witnesses for the state. He admitted that after the deceased had left the store, and was about 150 yards away, he got on his horse and rode in a fast trot until he overtook deceased; that he rode quite a distance along by the side of the deceased. He testified that when he rode up by the side of the deceased he said to him:

" 'Pretty cool this morning yet,' and he said, 'Yes,' and I

said, 'It will about clear off and frost to-night and kill off the fruit,' and he said 'Yes, I am afraid so,' and I said, 'I am intending to start over to Ford's', and he said, 'I don't think Ford is at home,' and I said, 'Yes, I saw him a while ago,' and he said, 'I thought he went over to Lacy's,' and I said, 'No, he said he would be at home,' and he asked me then 'Why did Ira go up and pay a fine?' and I said, 'Jesse, I don't know anything about that at all; I have taken no sides in it at all'—and he said, 'There was no use of it, for there was nobody at the schoolhouse that seen it that would say anything,' and I told him that I did not know anything about it, and he said, 'I will tell you right now it ain't quite over yet,' and I said, 'Why have you got a drove at my folks so?' and he says, 'Because Ira is the son of a bitch that stole pa's horse.' I said, 'Do you know for certain he stole that horse?' and he says, 'I do; that Lula told Alexander's folks and they told my Ma.' And I told. * * * I said I didn't know that. * * * I told him I did not think that; * * * that any man would hold up for a thing like that. Q. What then was done? A. By that time we got to the forks of the road and I pulled behind him to go into Ford's. He rode out a little piece to the forks of the road and pulled right across in there. Q. In the gate? A. Yes, sir; * * * in the gate, * * * and I pulled my horse right across and starting on to get away from him. * * * Q. What was then said or done? A. He turned around and said, 'You are a thieving son of a bitch yourself,' and I told him if he wanted to fight, 'let us get down and fight it out.' Q. What did you do then? A. In the meantime we had both stopped, and when I told him 'Let us get down and fight it out,' he says, 'All right,' and commenced pulling off his gloves. I got down off my horse then. Q. How did you get down? A. I got down just like a body would. Q. State which leg you put over the saddle, and which side? A. I got down on the left side of the horse, * * * the north side. Q. Go ahead. A. I took the reins over the horse's head. When I turned around and looked at Jesse, why he had his gun out and he was riding south back towards me. Q. What position in the gate did he get, * * * or about the gate did he get before he pulled up: Was he inside? A. He was inside of the gate, * * * on the north side of the gate when he pulled up. Q. State what occurred. A. When I saw him coming back I tried to run around the horse then. Q. Why did you do that? A. I was afraid he

. 3 Cr.—36

would shoot. Q. How was he holding his gun? A. Holding it in his right hand. * * * Q. Go ahead. A. And he rode up to me, and as I run around my horse run backwards, and when I turned back around he throwed down to shoot. Q. What did you do then? A. I commenced pulling my gun. Q. State whether or not when he pulled down did he shoot? A. When he pulled down it looked to me like his gun was cocked, and I believe it was just half cocked. Q. What did you do then? A. I pulled my gun, and as I brought it out it went off accidentally. * * * I shot the first shot."

Defendant also admitted on cross-examination that he told the sheriff of the county that he fired the first shot, and it was the first shot that hit Jesse Hungate. He admitted practically everything testified to by the witnesses Luttrell, Lacy, and Whalen for the state. The only material difference from his testimony and that of the witnesses for the state was that deceased turned his horse and rode back toward defendant before the shooting commenced. This was denied by the state's witnesses.

*Gilkerson & Tracy,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

McADAMS, SPECIAL JUDGE (after stating the facts as above). Defendant under his first assignment of error, contends that he could not be placed upon trial charged with a felony by information. We have read with a great deal of interest the ingenious argument presented by counsel for defendant in support of this contention, but are unable to agree with their reasoning. This question was decided adversely to the contention of defendant by this court, in *Re McNaught,* reported in 1 Okla. Cr. 528, 99 Pac. 241, and again by the Supreme Court of this state in the case of *Ex parte McNaught,* 1 Okla. Cr. 260, 100 Pac. 27. It is well settled in this state that a person charged with a felony may be tried in courts having jurisdiction of such offense by information properly verified, having first had a preliminary examination before an examining magistrate, or having waived such preliminary examination.

Defendant assigns as his second assignment of error that

the information does not conclude, as required by that portion of article 7, § 19, of the Constitution, which provides, "All indictments, informations and complaints shall conclude 'against the peace and dignity of the state,'" and is therefore void. Counsel for the defendant in their argument contend that the information is in violation of that portion of the Constitution just quoted, in that stating the offense of which the defendant was charged, "contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Oklahome," contains before the name of the county attorney, the following:

"The defendant, Ran Wood, having on the 4th day of April, 1908, had a preliminary examination on said charge before E. E. Tracy, a duly elected, qualified and acting examining magistrate of Roger Mills county, state of Oklahoma, and he, said Ran Wood, was by said E. E. Tracy on the 4th day of April, 1908, ordered committed and held in the county jail of said county and state to await the action of the district court on said above charge."

The contention of counsel for defendant is wholly without merit. The information in this case in a clear, concise and specific manner charges the defendant with the crime of murder, stating in detail the manner in which such homicide was committed, and charges that the killing so alleged by the defendant was contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Oklahoma.

In the case of *Canard v. State*, 2 Okla. Cr. 505, 103 Pac. 737, decided by this court July 27, 1909, it was held:

"In the prosecution of a defendant by information for a felony it is not necessary that the information should allege that there was a preliminary hearing before a committing magistrate, or a waiver of the same, although such facts must exist in order to authorize the filing of such information."

Again in the case of *Caples v. State, ante*, p. 72, 104 Pac. 493, decided by this court October 18, 1909, it was held:

"It is not necessary for an information charging a felony to allege that the defendant has had a preliminary examination before an officer authorized by law to hear the same, and has been

bound over to await final trial thereon, or has waived such examination. If these things have not been done, the defendant can present this question to the court by plea in abatement."

If it is not necessary for an information charging a felony to allege that the defendant has had a preliminary examination before an officer authorized by law to hear the same, and has been bound over to await the final trial thereon, or has waived such examination, then the question arises: Does such an allegation to an information as in this case render it in conflict with article 7, § 19, of the Constitution of the state, which provides, "All indictments, informations and complaints shall conclude 'against the peace and dignity of the state'" such as to render said information void, or is such allegation mere surplusage? The question, therefore, arises: What constitutes surplusage?

Mr. Bouvier, in volume 2 of his Law Dictionary (page 699), defines surplusage to be:

"Allegations of matter wholly foreign and impertinent to the case. All matter beyond the circumstances necessary to constitute the action is surplusage. When the whole of an allegation is immaterial to the plaintiff's right of action, it may be struck out as surplusage."

Rapalje & Lawrence's Law Dictionary (page 1245), says:

"Surplusage is where there is something in excess. In pleading surplusage is the allegation of unnecessary matter, and is forbidden. In most cases such matter will not vitiate the pleading, but will be disregarded."

Anderson's Law Dictionary (page 997):

"Matter, in any instrument, foreign to the purpose; whatever is extraneous, impertinent, superfluous, or unnecessary. Whatever may be stricken from the record without destroying the plaintiff's right of action, as, in a suit for a breach of warranty, that goods were not such as the defendant warranted them, * * * 'and that he knew this.'"

Cyclopedia Law Dictionary (page 888):

"Allegations of matter wholly foreign and impertinent to the cause. All beyond the circumstances necessary to constitute the action is surplusage. Cowp. 683; 5 East, 278; 10 East, 205; 2 Johns. Cas. (N. Y.) 52; 1 Mason (U. S.) 57; 16 Tex. 656."

Black's Law Dictionary (page 1143) says.

"Allegations of matter wholly foreign and impertinent to the cause. All matter beyond the circumstances necessary to constitute the action."

Broom's Legal Maxims (8th Ed.) p. 626, says:

"It is a rule of extensive application with reference to the construction of written instruments, and, in the science of pleading, that matter which is mere surplusage may be rejected, and does not vitiate the instrument or pleading in which it is found. * * * 'Surplusagium non nocet' is the maxim of our law."

In *Commonwealth v. Peto,* 136 Mass. 157, the Supreme Court of that state said:

"The second ground assigned in the motion to quash should not have been sustained. If the complaint was defective, it was so in form only, and the motion was filed too late. Pub. St. c. 214, § 25; *Commonwealth v. Emmons,* 98 Mass. 6; *Commonwealth v. Blanchard,* 105 Mass. 173; *Commonwealth v. Doherty,* 116 Mass. 13. But we do not perceive that the complaint was legally defective, even in form. It averred the keeping of intoxicating liquors with intent to sell the same, without being authorized so to do by virtue of St. 1869, c. 415, an act which was then repealed; but it further averred that these liquors were thus kept without any legal authority whatever. . The allegations as to St. 1869, c. 415, were therefore superfluous. and might properly be treated as surplusage."

In *State v. Elliott,* 14 Tex. 426, it is said:

"But it is objected in effect that too much was attempted, and that the indictment is bad by reason of the recitals. If these contained anything contradictory or repugnant to the body of the indictment, or were of a character to render unintelligible any of the material, traversable matters constituting the charge, there might be force in the objection. But such manifestly is not the case. The grand jury have undertaken, very needlessly, it is true, to recite the history of the lost indictment. And it is also true, as suggested in the argument, that this was quite foreign to their appropriate province. It was matter wholly foreign and irrelevant. And that it was so brings it, in the strictest sense, within the definition of surplusage, which does no injury. For, in general, 'surplusagium non nocet,' according to the maxim 'Utile per in utile non vitiatur.' Matter which is merely useless never vitiates."

In *State v. Sarlls*, 135 Ind. 200, 34 N. E. 1130, the Supreme Court of Indiana said:

"If the language quoted could be treated as surplusage, the motion to quash should not prevail. By statute, 'surplusage' or 'repugnant allegation' does not render an indictment insufficient, 'when there is sufficient matter alleged to indicate the crime and person charged.' Clause 6, § 1756, Rev. St. 1881; *State v. McDonald*, 106 Ind. 233 [6 N. E. 607]; *Myers v. State*, 101 Ind. 379; *State v. Judy*, 60 Ind. 138."

"It is a general rule, irrespective of statute, that surplusage does not vitiate, and, to aid the sense, it may be rejected. (*State v. Judy, supra.*)

In *State v. Pierce*, 8 Nev. 296, the court aid:

"It is again objected that the indictment is insufficient. A careful perusal satisfactorily shows it to be perfectly good, though, perhaps, through excess of caution containing more than the statute demands; but in this superfluous matter, if so it be, there is nothing to perplex one of ordinary understanding, nor to injure this appellant."

In *Travis v. Commonwealth*, 96 Ky. 77, 27 S. W. 863, the court said:

"The indictment reads as follows: 'The said Travis and Hendricks heretofore, to wit, on the —— day of December, A. D. 1893, in the county aforesaid, did unlawfully and feloniously take, steal, and carry away, with the intent to convert to their own use, from J. L. Ewell, $30 in good and lawful currency of the United States of Kentucky, a better description of which is not here given because the same is to the grand jury unknown, said $30 then and there belonging and was in the possession of said J. L. Ewell, and the said Travis and Hendricks did feloniously convert the same to their own use, and deprive the said Ewell of same,' " etc.

The court then proceeds as follows:

"In an indictment for the larceny or embezzlement of money or United States currency or bank notes, it is sufficient to allege the larceny or embezzlement of the same, without specifying the coin, number, denomination, or kind thereof. Section 135, Criminal Code. The indictment meets all the requirements of the Code, and the offense is specific and complete; the words 'of Kentucky' being mere surplusage and meaningless, and in no way calculated to mislead defendant to his prejudice."

In *State v. Noble,* 15 Me. 477, the court said:

"It may be regarded as a general rule, both in criminal prosecutions and in civil actions, that an unnecessary averment may be rejected, where enough remains to show that an offense has been committed, or that a cause of action exists."

In *State v. Webster,* 39 N. H. 96, the court said:

"All unnecessary words in an indictment may, on trial or arrest of judgment, be rejected, as surplusage, if the indictment will be good upon striking them out. *State v. Bailey,* 31 N. H. 521; Wharton's Cr. Law, 165; 1 Ch. Cr. Law, 238; *Rex v. Edwards & Morris,* Leach, 127; *Commonwealth v. Arnold,* 4 Pick. [Mass.] 251; *Commonwealth v. Hunt,* 4 Pick. [Mass.] 252. By striking out in this indictment the words, 'certain persons unknown, of whom,' and the words 'was one,' and again the words, 'said persons unknown, of whom,' and 'was one,' and the indictment is in proper form, as founded upon section 5, c. 217, Rev. St., for assaulting and obstructing the officer."

In *Castles v. McMath,* 1 Ala. page 328, the court said:

"The duplicity complained of in the declaration is that, after setting forth that the bill was protested for nonacceptance, it goes on to allege a protest for nonpayment also. In *Evans v. Watrous,* 2 Port. 205, it was determined 'that under our statute, which prohibits special demurrer where there is a clear and substantial cause of action set forth in a declaration, though it may contain irrelevant or superfluous matter, or though it may contain duplicity, yet the defendant shall be held to answer it.' It is not pretended that the declaration does not contain a good cause of action; but the objection is that some of its allegations are superfluous, and consequently affords no cause for reversal."

In *Commonwealth v. Rowell,* 146 Mass. 130, 15 N. E. 155, the court said:

"The complaint must allege all the material elements which constitute the offense charged, and they must be proved. And if the complaint unnecessarily alleges anything which is descriptive of the identity of the offense, it must be proved as alleged. But any allegations not descriptive of the identity of the offense, which can be omitted without affecting the charge against the defendant, and without detriment to the complaint, may be treated as surplusage, and need not be proved." (*Commonwealth v. Pray,* 13 Pick. 359; *Commonwealth v. Cooley,* 10 Pick. 37; *Commonwealth v. Lewis,* 1 Metc. 151.)

We could multiply authorities to the same effect without limit upon this question, but we deem the foregoing to be sufficient. So far as the information against the defendant in this case is concerned, charging the offense, it closes with the words "against the peace and dignity of the state." The allegation following this was matter wholly foreign and irrelevant to the information. It neither added to nor took from any of the material matters constituting the charge. It is therefore surplusage pure and simple. It constitutes no part of the information. Under the authorities above cited, it should be disregarded and treated as a nullity.

The third assignment of error is that the court erred in overruling defendant's challenge to the panel of jurors. Chapter 89, art. 8, of Snyder's Comp. Laws Okla. provides the manner in which a challenge to the petit jury may be made. Section 6795 provides that:

"A challenge to the panel can be found only on a material departure from the forms prescribed by law, in respect to the drawing and return of the jury, or on the intentional omission of the sheriff to summon one or more of the jurors drawn from, which the defendant has suffered material prejudice."

Section 6796 provides:

"A challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge."

Section 6799 provides:

"If the challenge is denied, the denial may, in like manner, be oral, and must be entered upon the minutes of the court, and the court must proceed to try the questions of fact."

Section 6800 provides:

"Upon the trial of the challenge, the officers, whether judicial or ministerial, whose irregularity is complained of, as well as any other presons, may be examined to prove or disprove the facts alleged as the ground of challenge."

It will be seen from section 6795 of this act that the challenge to the panel must be founded on facts from which the defendant has suffered material prejudice. In this case the challenge simply charges that the jury commissioner Joe Moad was

interested in the prosecution of this case, and undertakes to set out to what extent he was so interested. It nowhere charges that any member of the jury taken from the jury list selected by him as such jury commissioner was in any way biased or prejudiced against the defendant, or that the jury commissioner Moad had, at any time prior to the selection of them for jury service, ever conversed with them concerning this prosecution, or otherwise attempted to any way influence their action. While it is the duty of the trial court, when a challenge to the jury panel is presented to it, to try the issue of fact when the same is properly denied, yet it is not error for the court to overrule such challenge where it fails to state facts sufficient to justify the court in discharging the jury, if true. The grounds of challenge in this cause were insufficient to warrant the court in discharging the jury. Therefore no error was comitted in overruling the challenge.

The court charged the jury in part as follows:

"Thirteenth. If you believe from the evidence in this case beyond a reasonable doubt that the killing of Jesse Hungate by the defendant was not justifiable, as justification and self-defense are explained in these instructions, it will then be your duty to determine the degree of the felonious homicide. It you believe from the evidence beyond a reasonable doubt that the defendant in the county of Roger Mills and state of Oklahoma, on the 29th day of March, 1908, shot the deceased and wounded him, from the effects of which he soon thereafter died, and that the defendant fired the fatal shot at the deceased with the premeditated design to effect the death of said Jesse Hungate, you will then find the defendant guilty of murder and fix his punishment at death, or by imprisonment in the state penitentiary at hard labor for life, at your discretion. But if you have a reasonable doubt, after considering all the evidence in the case, as to whether the killing was perpetrated with a premeditated design to effect death, and do find and believe from the evidence beyond a reasonable doubt that the killing was done in the heat of passion by means of a dangerous weapon, then you will find the defendant guilty of manslaughter in the first degree. Or if you find that the killing was unlawful, and that it was neither murder, manslaughter in the first degree, nor justifiable homicide, you will find the defendant guilty of manslaughter in the second degree."

"Sixteenth. The defendant has interposed the defense of justifiable homicide or what is commonly known as self-defense. It, therefore, becomes my duty to instruct you in relation to this defense. If a person is assaulted in such a manner as to produce on the mind of a reasonable person a belief that he is in actual danger of losing his life, or suffering great bodily harm, he will be justified in defending himself, though the danger be not real, but only apparent. Such person will not be held responsible criminally if he acts in self-defense from real and honest convictions as to the character of the danger reasonably induced by reasonable evidence, though he may be mistaken as to the extent of the real danger; and, where one without fault is attacked by another, and kills his assailant, if the circumstances furnish reasonable ground for apprehending a design to take his life or do him some great bodily harm, and if he believes the danger imminent and such design will be enforced, homicide is justifiable.

"Seventeenth. In considering the evidence in the case for the purpose of determining whether or not the defendant acted in good faith and fired the fatal shot under the belief that he was in danger of losing his life or receiving great personal injury, it will be your duty to view the circumstances and the evidence from the standpoint of the defendant and as they reasonably appeared to him at the time he fired the shot that killed the deceased."

"Nineteenth. If you find and believe, however, from the evidence that the defendant on the morning of the killing overtook and rode with him in the public road without any intention of provoking a difficulty with the deceased until they arrived at the place of the killing, and that the defendant on turning to leave the deceased heard the deceased using insulting words towards him, and at the time the deceased used such insulting words, if you find such words were used, the defendant had no intention of provoking a difficulty with the deceased, but upon hearing such insulting words, if any, from the deceased was angered by the same, and halted and challenged the deceased to mutual combat, and if you find that the deceased responded to such challenge in the affirmative, whereupon the defendant dismounted from his horse, and in good faith intended to combat or fight the deceased without using any deadly weapon, when he discovered a pistol in the deceased's hands, and that then and there the defendant stepped behind his horse and drew his pistol and fired at the deceased, and at the time of so firing from the attitude and

manner of the deceased the defendant had reason to believe, and did believe, that the deceased was about to take his life, and that the defendant fired the fatal shot under these circumstances, then he would be justifiable regardless of which shot of the defendant killed the deceased, and it will be your duty to acquit him. If, however, you should find from the evidence that the defendant challenged the deceased to mutual combat with their revolvers, and pursuant to such challenge several shots were fired by the deceased and the defendant towards each other, one of which struck and killed the deceased, then the defendant would be guilty of murder, and it would be immaterial as to which one of the combatants fired the first shot, and you should say so by your verdict."

Counsel for the defendant contend that the thirteenth instruction is erroneous in that it practically directs the jury, if they found that the defendant killed the deceased while in a heat of passion and by means of a deadly weapon, then the defendant would be guilty of manslaughter in the first degree. This position of counsel is wholly untenable. The court in this instruction, in its beginning, charged the jury:

"If you believe from the evidence in this case beyond a reasonable doubt that the killing of Jesse Hungate by the defendant was not justifiable, as justification and self-defense are explained in these instructions, it will then be your duty to determine the degree of felonious homicide."

This instruction must be considered as a whole, and, construing it as such, the court properly charged the jury that they must consider the other charges relevant to the justification and self-defense as explained in the instruction. Reading this instruction in connection with the other instructions, the jury could not have been misled. There was no error in giving this instruction.

Counsel for defendant criticizes that portion of the sixteenth instruction which says:

"If a person is assaulted in such a manner as to produce, on the mind of a reasonable person a belief that he is in actual danger of losing his life, or suffering great bodily harm, he will be justified in defending himself, though the danger be not real"— and contends that it is erroneous in that it consists in substituting the mind of some hypothetical reasonable person for the mind

of the person assaulted. This instruction is somewhat inaccurately drawn, but in view of the other instructions, we cannot hold, as a matter of law, that it is erroneous. This instruction must be considered in connection with the other instructions. The court in the seventeenth instruction charged the jury that they must view the circumstances and the evidence from the standpoint of the defendant as they reasonably appeared to him at the time he fired the shot that killed the deceased. It will be seen from this instruction that the jury was directed not to consider the facts and circumstances from the standpoint of a reasonable person, but from the standpoint of the defendant alone. We find no error in this instruction.

Counsel for defendant, in criticizing the nineteenth instruction, says:

"From the entire instruction, it will be seen the court made the right of defendant to self-defense, depend upon the absence of any intention to provoke a difficulty. It thus would say to the jury, in substance: 'If you do not believe that he was without intention to provoke a difficulty, whatever else transpired, you cannot give him the benefit of the law of self-defense.' Besides, it would say that if this defendant intended to have a fist fight with the deceased, he could not defend himself against the most deadly, sudden, and violent of assaults."

We have carefully examined this instruction of the court, and have reached the conclusion that it is far more liberal to defendant than the law demands. Under this instruction, if the jury found and believed from the evidence that the deceased spoke insulting words to the defendant, and the defendant, being angered thereby, challenged the deceased to a mutual combat, without intending to use any deadly weapon, but intending merely an ordinary battery, and the deceased responded to such challenge with a pistol, and from his attitude and manner led the defendant to believe that deceased was about to take his life, defendant would, under these circumstances, be justified in killing the deceased. This is not the law. A person cannot challenge another to a mutual combat, although without intending to kill, but intending an ordinary battery merely, and avail himself of the right of self-

defense, even though his adversary may respond to such challenge with a deadly weapon, and cause him to believe that his life is in danger, or that he is in danger of great bodily harm, without first notifying him by word or act that he intends to abandon the combat; and, if he kills his adversary without notifying him by word or act that he intends to abandon the combat, such killing constitutes manslaughter.

In this case the defendant himself admitted that, while armed with a 45-calibre revolver, he challenged deceased to fight him, got down off his horse for that purpose, and, seeing the deceased with a revolver in his hand, and in an attitude which caused the defendant to believe he was about to be killed, drew his revolver and commenced firing at the deceased. Defendant may not have intended to draw his revolver when he challenged deceased to fight him, and may have intended only an ordinary battery, yet this intention did not give him the right to invoke the law of self-defense, because at the very time he fired the fatal shot he was carrying out his design and purpose to fight the deceased. He had not, by word or act, given the deceased reason to believe that he intended to abandon the combat. Conceding that defendant, at the time he fired the fatal shot, believed he was in danger of losing his life or suffering great bodily harm, he is estopped, under his own version of the affair, to invoke the law of self-defense, because he did that which in the very nature of things was calculated to induce the deceased to do just what he did do, and the defendant must have known, and did know, that his own conduct caused the deceased to act as he did, and this was known to defendant before he shot. Therefore, if the defendant provoked an altercation between himself and the deceased, or challenged the deceased to a mutual combat, without intending to kill deceased, but intending an ordinary battery merely, and the deceased assaulted defendant, or by some act done gave defendant reasonable apprehension of loss of life or great bodily harm, and the defendant killed the deceased to protect himself from the apprehended danger, the killing under such circumstances would not be justifiable, but would be manslaughter.

In the twenty-eighth assignment of error defendant complains of the conduct of counsel for the state, in that Hon. W. I. Gilbert, who assisted in the prosecution, in his closing argument to the jury (addressing defendant) said:

"You know you shot poor Jesse Hungate in cold blood, and committed cold-blooded murder. What did he say? You know that he made a statement there that you have not told. Oh, you may sigh and swallow, but you know that it is so."

That further in said argument, counsel stated:

"Gentlemen of the jury, it has come to a point when murder must be stopped in this country; murders have been altogether too frequent. I will tell you of a case where a man committed cold-blooded murder and was released by a jury."

And that further in said argument the said W. I. Gilbert argued to the jury that the defendant had applied for bail, and that it had been refused. To these remarks defendant duly excepted, and it is now claimed that this argument constituted such misconduct on the part of the state as to cause a reversal of this cause. This court has repeatedly held that as to remarks of counsel in the course of their arguments, objected to as improper, in order to constitute reversible error, the impropriety indulged in must be such as to influence the verdict. Section 6957, Snyder's Comp. Laws Okla., is as follows:

"On an appeal the court must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

The letter and spirit of this statute is that if this court can say, after carefully considering the entire record in the case, that the conviction is sufficiently supported by competitive evidence, and that the verdict was not reached by error or as a result of passion and prejudice, the conviction should be affirmed. From a careful investigation of the record in this cause this court cannot come to any other conclusion, considering the version of the facts from the standpoint and testimony of the defendant alone, but that he was guilty of manslaughter. The jury were jutified under his own statement in rendering the verdict which they did. In view of this statute and defendant's testimony we

are compelled to hold that the remarks of counsel did not in any way or manner influence the verdict of the jury; and, while such remarks were highly improper, yet they will not work a reversal of this cause.

After a careful consideration of all the other assignments we are of the opinion that no error was committed affecting the substantial rights of the defendant.

For the reasons herein given, the judgment of the lower court is affirmed, with directions to the sheriff of Roger Mills county to carry the same into execution.

DOYLE, and OWEN, JUDGES, concur.

FURMAN, PRESIDING JUDGE, having been of counsel in the case, and being thereby disqualified as one of the judges to hear and determine the same, and this fact being duly certified to Governor C. N. Haskell, he thereupon appointed E. G. McADAMS as special judge of the Court of Criminal Appeals for the hearing and determination of this case.