## JOHN BOUTCHER v. STATE.

No. A-165.   Opinion Filed November 23, 1910.

Rehearing Denied January 5, 1911.

1.   TRIAL—Opening Statement to Jury. After the jury has been empaneled, and before the witnesses have testified in the case, the county attorney has the right to make an opening statement of the facts to the jury so as to enable them to understand the issues presented and see the relation of the facts to each other as they are introduced in evidence. This opening statement is made subject to the control of the trial judge.

2.   INSTRUCTIONS—Requests Covered by General Charge. When the jury are correctly instructed as to the law of the case in the general charge of the court, it is not error to refuse special instructions, though correct, when those requested are only a repetition of that which had been previously given to the jury.

3.   JURY—Disqualifications—Excusing by Court Without Challenge. If, for any reason, the trial court is of the opinion or even suspects that any juror is not fair and impartial, it is the right and duty of such court to excuse such juror, either upon the challenge of one of the parties, or upon motion of the court, and such action will be upheld upon appeal unless it clearly appears from the record the trial court had abused its discretion to the injury of the defendant.

4.   APPEAL—Instructions—Necessity of Exceptions. Where no exceptions are reserved to the instructions of the court, none except fundamental errors will be considered by this court.

5.   HOMICIDE—Self-Defense—Mutual Combat. When a defendant voluntarily enters into a mortal combat with the deceased, knowing or having reason to believe that it will or probably may result in death or serious bodily injury to himself or to the deceased, the defendant cannot claim that he acted in self-defense in taking the life of the deceased, it matters not to what extremity he may be reduced in the conflict; and such

killing will be murder, unless before the fatal shot is fired, he in good faith withdrew or attempted to withdraw from the combat, , and either by word or act made that fact known to the deceased, and the latter thereafter continued to press him, and gave the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the deceased's hands.

6.  **HOMICIDE—Manslaughter—Sufficiency of Evidence.** For facts sustaining a conviction for manslaughter upon the ground of mutual combat, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Coal County; A. T. West, Judge.*

Defendant was convicted of the crime of manslaughter and sentenced to four years' confinement in the state penitentiary, and he appeals. Affirmed.

*Cutler, Trice & McInnis,* for plaintiff in error.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

· FURMAN, Presiding Judge. First. Counsel for the appellant complain that "the court erred in permitting the county attorney, over the objection of plaintiff in error, to state to the jury what facts he expected to prove on the trial of said cause, said statement being made before the giving of any testimony in the case, and just after the empaneling of the jury." This question has been passed upon adversely to the contention of counsel in the case of *Sturgis v. State,* 2 Okla. Cr. 362. There this court said:

"This statement is made to enable the jury to understand the issues before them and more readily see the relation of each fact relied upon to the issues presented. It is therefore proper to state fully the questions which the jury will be called upon to decide, so that they may start their investigation with a clear conception of what is before them."

The opening statement should be made subject to the control of the trial judge.

Second. The killing was admitted and the plea of self-defense was interposed. A number of special instructions upon the law of self-defense were requested by the defendant and refused by

4 Cr.—37

the court. Upon examination we find that the law contained in the special instructions requested and refused was contained in the general instructions given to the jury. Where the law is correctly given in the main charge of the court, it is not error to refuse special instructions which, though correct, are only a repetition of that which was previously given to the jury. We therefore hold that the court did not err in refusing to give the special instructions requested by the defendant, because the law had already been given in the general charge of the court.

Third. Counsel for the defendant complain that the court erred, while the jury was being empaneled, by holding that the jurors Marsh Landon and W. R. Hunt were disqualified. The record discloses the following facts with reference to said jurors:

"Marsh Landon, one of the jurors testified as follows: Q. You live at Lehigh? A. Yes. Q. You were present at the preliminary examination of this case? A. Yes, a part of it. Q. You heard witnesses testify in the case? A. Yes. Q. State whether or not from the testimony that you heard, you formed an opinion as to the guilt or innocence of this defendant? A. No, sir; I do not know that I formed any opinion. Q. Did you remain in the court room until this preliminary trial was concluded? A. No, sir; I think not. The Court: Did you hear the defendant testify in the case? Mr. Woods: He did not testify. Q. Have you now any opinion as to the guilt or innocence of the defendant? A. No, sir. Q. How many witnesses did you hear testify in the preliminary examination? A. I could not say. Q. Did you hear as many as two? A. Yes, I think as many as two. Q. Did you hear the Indian testify? A. No, sir; I did not hear him. Q. Were the witnesses you heard men or women? A. One woman, and I do not remember the man; there was one called directly after her—I do not remember his name. Mr. Trice: Q. Have you now any opinion as to the guilt or innocence of this defendant? A. No, sir. Q. Have you from hearsay or otherwise formed such an opinion as to the guilt or innocence of this defendant as would influence you in rendering a verdict? A. No, sir. Q. Can you now go into the jury box and give this defendant a fair and impartial trial according to the law and the evidence in the case? A. Yes. The Court: From the witnesses that you have heard testify in the preliminary examination, did they purport to detail the occurence

there that morning—in other words, did they go ahead and tell all about the killing? A. Yes, I think that the lady did. Q. She detailed all of the circumstances of the killing? A. Yes. The Court: This juror will be excused. Mr. Trice: The defendant excepts to the ruling of the court. W. R. Hunt, one of the jurors, testified as follows: Q. How many witnesses did you hear testify in this case on the preliminary trial? A. One or two. Q. The witnesses that you heard testify, did they detail the circumstances of the killing? A. Yes, I heard that woman and a man; I do not remember the man's name. Q. And they detailed the circumstances of the killing there in your presence? A. Yes. The Court: It seems to me that where a juror has sat and listened to the detailed circumstances of the homicide, that he would certainly be disqualified. The defendant is entitled to a fair and impartial trial and the state is entitled to a fair and impartial hearing, and I believe that I will excuse this juror. The defendant excepted to the ruling of the court."

The contention of the defendant is that the court was without power to excuse a juror upon its own motion. With this contention we cannot agree. Necessarily a very large discretion is vested in the trial court in determining the competency and qualifications of jurors; and its discretion in doing so will never be disturbed by the appellate court, unless the record clearly shows an abuse of this discretion to the injury of the defendant: The defendant has no vested right to have any member of the panel sit upon the jury until after he has been accepted and sworn as a juror. The right of the defendant with reference to the members of the panel is that of rejection rather than of selection. If, for any reason, the trial court is of the opinion or even suspects that any given juror is not fair and impartial or is otherwise disqualified, it is not only the right but it is also the duty of the court to excuse such juror either upon the challenge of one of the parties or upon the motion of the court without such challenge. *In Cochran and Blevine v. U. S.,* 14 Okla. 111, Judge Burwell said:

"But it is said that the court, on its own motion, excused a juror after the defendant's challenges were all exhausted. It not only had a right to do so, but, if the juror was not a proper person, it was its duty to excuse him, and it was under no obli-

gation to assign any reason therefor. The argument that such a rule affords courts an opportunity to 'railroad' defendants to the penitentiary has no force, for the power could just as easily be used to acquit a criminal. That the inherent power exists, in the absence of statute, there can be no doubt; and if an unbiased, qualified juror is put in his place a defendant cannot complain, as he had no legal right to be tried by any particular jury. It is only after the jury has been sworn that a defendant can insist that his cause be submitted to them. (*City of Guthre v. Shaffer*, 7 Okla. 459, 49 Pac. 698). As contended by the defendant, if the court can excuse one juror it may excuse more, but it is reasonable to assume that a trial court will exercise a wise discretion in the matter. If however, the record shows that it has abused its discretion, the appellate court may review its action and grant a new trial. Experience has taught us that more errors are made by trial courts in favor of defendants than against them; and this is because of the fundamental principle which underlies our criminal jurisprudence: That the defendant is entitled to the benefit of every reasonable doubt. This doubt is extended to him, not only by the jury when weighing the evidence, but also by the courts in construing the law; and that courts hesitate to exercise the power complained of here is evidenced by the fact that this is the first time since the organization of the territory that this court's attention has been directed to a question of this kind in a criminal case. A trial court might, in a thousand ways, exercise its power to the detriment of a defendant, yet this same power is absolutely essential to his protection, and courts should not exist without it. It is not claimed that the juror selected in the place of the one excused was not qualified, was not selected as provided by law, or was biased or prejudiced. This being true the defendant cannot complain."

Fourth. No exceptions were reserved to the instructions given. We find them free from fundamental errors. We therefore will not consider the criticisms contained in the brief on these instructions.

Fifth. It is contended that the verdict of the jury is not supported by the testimony. The defendant and the deceased were brothers-in-law, and for some time prior to the homicide the defendant had lived at the home of the deceased. R. O. Donham testified that, on the Monday preceding the homicide, the witness

traded a pistol to the defendant for a shotgun. This witness also testified that the defendant had told him that he and the deceased had had some difference about a horse; that the defendant had purchased a horse; that the deceased had promised to let him have the money to pay for it, and then refused to do so. Frank Donham, a fourteen year old boy, and a son of R. O. Donham, testified that, between the time the defendant traded for the pistol from the father of the witness and the homicide the defendant was at the house of the father of the witness, and that the witness heard defendant say to the mother of the witness: "If Charlie Goodale ever fools with me I'll blow him full of daylight holes." Mrs. Mollie Goodale, the wife of the deceased and the sister of the defendant, testified:

"Q. What relation, if any, existed between you and Charles Goodale? A. He was my husband. Q. What relation, if any, existed between you and John Boutcher, the defendant? A. He is my brother. Q. Where is your husband? A. He is dead. Q. Were you present at the difficulty that was had between them last December? A. Yes, sir. Q. Where did this difficulty occur? A. There at home. Q. Where is that? A. Three and one-half miles east of Olney. Q. Is that in Coal county? A. Yes. Q. What time of day was this difficulty? A. It was early in the morning, somewhere between seven and eight o'clock. Q. Had you had breakfast? A. Yes. Q. What day was it? A. It was Saturday, the 14th day of December. Q. 1907? A. Yes. Q. Just go on and relate to the court and jury the transaction of that difficulty just as you know it and in your own way. A. Well, the difficulty first began—my brother was going to be married on Sunday, the next day, and he wanted to borrow the wagon and team; the wagon had some cotton seed on it we had just hauled in from the gin the day before; my brother asked my husband where would he put those cotton seed and he would empty the wagon for him—he wanted the wagon and team the next day. My husband told him that we wanted to use the wagon and team on Sunday; for him to go and get Mr. Grant's wagon and team. My brother said all right, then. My husband then turned and went out of the house to go out to harness his horses. He was fixing to go after a hog that he had bought. Q. That was your husband? A. Yes, and he told me to get the check book and

fill out a check for the money for the hog. I was sitting there filling out the check; my brother was sitting there in the house— he commenced to make some remarks to me—I don't remember just what the words were, but he was saying something about it— my husband came back in the house, and when he came in he heard him talking to me like he was and he ordered him out of the house. He got up and went out of the house and asked my husband to follow him, and I went out right behind them, and they commenced fussing. I got between them several times, begging them to hush, but neither one of them wouldn't listen to me, and I asked my brother to leave, and he said that he would leave; he kept saying that he would, and put the saddle on his horse, but he never offered to leave, just kept standing around there and they kept jawing. I got between them several times and talked to them both, but neither one of them would listen to me at all, and my husband went and got the bridles and started to put them on the horses, but he never got to the horses with the bridles; and then I do not know if there was airy lick passed between them or not, but there was something— The defendant objects. The witness: I cannot remember where I was when my husband started in the house, but I remember of being in the house when he started out with his gun. That is the best that I can remember, and I tried to stop him with his gun and held to his gun until he went out at the door. When he went out of the door, I pushed the door to and went into the other room; when I pushed the kitchen door shut the door came back open again. Q. The outer door? A. Yes, the kitchen door; and I stayed in the other room a few minutes and started back to them in the yard, and met my husband in the door—I could not tell how many shots were fired, there was some three or four. Q. There were some three or four shots fired? The defendant objects. The court overrules the objection. Q. Did you see your brother when you got out? A. Yes, when I first seen him he was standing between that house and the smoke house; then he jumped on his horse and started towards the gate and throwed his gun up and fired twice and went on down the road. Q. What direction did he go? A. He went out at the big gate and then went east up the road."

It was proven that deceased died from the effects of the wounds which he then received. The testimony shows that there had been a previous difference between the defendant and the deceased, and that the defendant had stated that if the deceased

ever fooled with him he would blow him full of daylight holes. The purchase of the pistol under these conditions is a significant circumstance. When the altercation began in the house between the defendant and the deceased, it is immaterial as to who was in the wrong, because when the deceased ordered the defendant to leave the house, the defendant replied by asking the deceased to go out with him. In the light of the testimony in the case the jury was authorized to treat this invitation from the defendant to the deceased as a challenge. It at least indicated such a willingness to fight as would make the defendant liable under the law of mutual combat, and it fully justified the instructions of the court upon that branch of the case. It is the undoubted law that if a defendant voluntarily enters into a mutual combat with the deceased, knowing or having reason to believe that it will or probably may result in death or serious bodily injury to himself or the deceased, and if, in such conflict, he slays his adversary, he cannot claim self-defense, it matters not to what extremity he may be reduced in the conflict, and such killing will be murder, unless, before the fatal blow is struck or the fatal shot is fired, the defendant in good faith withdrew or attempted to withdraw from the combat, and either by word or act made that fact known to the deceased, and the latter thereafter continued the assault and gave the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the deceased.

If the jury had taken an extreme view of the evidence they would doubtless have convicted the defendant of murder; but it is evident that they gave him the benefit of the doubt upon the question of the intention of the defendant in inviting or challenging the deceased to go out of the house with him, and in the altercation which ensued in the yard, and found that it was not the purpose of the defendant to engage in a combat with the deceased which would endanger life or limb, but that the defendant's intention was to engage in a combat which would not be more than a battery; and, so believing, they were justified in con-

victing the defendant of manslaughter. The law with reference to such combats is clearly stated by McAdams, Special Judge, in *Wood v. State,* 3 Okla. Cr. 553, 107 Pac. 945, as follows:

"* * * A person cannot challenge another to a mutual combat, although without intending to kill, but intending an ordinary battery merely, and avail himself of the right of self-defense, even though his adversary may respond to such challenge with a deadly weapon, and cause him to believe that his life is in danger, or that he is in danger of great bodily harm, without first notifying him by word or act that he intends to abandon the combat; and, if he kills his adversary without notifying him by word or act that he intends to abandon the combat, such killing constitutes manslaughter.

"In this case the defendant himself admitted that, while armed with a 45 caliber revolver, he challenged deceased to fight him, got down off his horse for that purpose, and, seeing the deceased with a revolver in his hand, and in an attitude which caused the defendant to believe he was about to be killed, drew his revolver and commenced firing at the deceased. Defendant may not have intended to draw his revolver when he challenged deceased to fight him, and may have intended only an ordinary battery, yet this intention did not give him the right to invoke the law of self-defense, because at the very time he fired the fatal shot he was carrying out his design and purpose to fight the deceased. He had not, by word or act, given the deceased reason to believe that he intended to abandon the combat. Conceding that defendant, at the time he fired the fatal shot, believed he was in danger of losing his life or suffering great bodily harm, he is estopped, under his own version of the affair, to invoke the law of self-defense, because he did that which, in the very nature of things, was calculated to induce the deceased to do just what he did do, and the defendant must have known, and did know, that his own conduct caused the deceased to act as he did, and this was known to defendant before he shot. Therefore, if the defendant provoked an altercation between himself and the deceased, or challenged the deceased to a mutual combat, without intending to kill deceased, but intending an ordinary battery merely, and the deceased assaulted defendant, or by some act done gave defendant reasonable apprehension of loss of life or great bodily harm, and the defendant killed the deceased to protect himself from the

apprehended danger, the killing, under such circumstances, would not be justifiable, but would be manslaughter."

The jury saw and heard the witnesses and believed the testimony for the state. We cannot say that their verdict is not supported by the evidence. The judgment of the lower court is therefore affirmed.

DOYLE and RICHARDSON, JUDGES, concur.

## ON MOTION FOR REHEARING.

### Denied January 5, 1911.

INSTRUCTIONS—Requests and Objections—Record. When the evidence in a criminal case is concluded the judge should give counsel for the state and counsel for the defendant an opportunity to submit any written instructions which they may desire to be given to the jury, and should also give counsel an opportunity to be heard, either, in support of or in opposition to instructions to be given to the jury; and the court should require counsel for the defendant, upon such hearing, to point out what objections, if any, they have to the instructions given to the jury, and these objections should be incorporated in the record.

(Syllabus by the Court.)

PER CURIAM. Counsel for the appellant, on motion for rehearing, insist that the instructions in this case were properly excepted to, and they refer to the case-made for the verification of this statement.

After the court had given its charge to the jury, counsel for the defendant stated in open court: "The defendant desires to except to each and every paragraph of the court's instructions to the jury." It is true that, in the case of *Frank Buck v. Territory,* 1 Okla., Cr. 517, this court did consider similar exceptions to the instructions given, but upon more mature reflection we are satisfied that we were in error in this particular. The action of the court in considering Buck's case could not have operated to the injury of appellant in this case, because that case was not decided by this court until the 11th day of January, 1909, while the

exceptions which are presented here were taken by the defendant on the 17th day of October, 1908, nearly three months before the rendition of the opinion in the Buck case. We think that paragraph 5 of section 6823 of Snyder's Comp. Laws of Okla. 1909, is decisive of this question. Said paragraph is as follows:

"When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions,, and may give or refuse any instructions asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge, if modified, modification shall be shown in the instructions, and by refusal to give instructions, or the modification thereof, shall be deemed to be excepted to. When the instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury."

This section clearly contemplates that instructions to juries in criminal cases should be settled before they are read to the jury, and that if counsel have any instructions which they desire to be given, or if they have any objections to any instructions proposed to be given by the court, it is the privilege and duty of counsel to point out such matters to the court before the instructions are read to the jury. Counsel for the defense have the right to be heard in the trial court upon the law as well as upon the facts. This is fair to all parties concerned, and is necessary to the proper administration of justice. It gives the judge an opportunity to correct any errors which he may have made, and it gives the county attorney an opportunity, if he thinks the charge of the court is erroneous, to join with the defendant in requesting that such error be corrected. If counsel desire to make objections to the instructions which the court proposes to give to the jury and requests permission to do so, it would be error on the part of the trial court to refuse to give counsel such opportunity; but in the absence of any such request appearing in the record in this case, we are of the opinion that

the exceptions attempted to be taken by counsel for the defendant are altogether insufficient. The instructions given are not above criticism, but in the light of the evidence they are not such as should work a reversal of the verdict. The evidence in the case would support a verdict for murder, and we think that the appellant should congratulate himself upon the zeal and ability of his counsel in securing a verdict of manslaughter with the lowest possible punishment.

The motion for rehearing is therefore denied.