## CHARLES EVANS v. STATE.

No. A-1099.   Opinion Filed September 14, 1912.

(126 Pac. 586.)

1.   **HOMICIDE—Self-Defense—Justification.**   One who kills another under an apprehension of death or great bodily harm from assault must have been free from fault in bringing on the difficulty in order to justify the homicide.

2.   **SAME—Mutual Combat—Self-Defense.**   Where the killing was done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death to one or the other of the combatants, the defendant cannot justify on the ground that it was committed in self-defense, and it will be manslaughter at least, unless the defendant can prove that before the mortal stroke was given he had refused any further combat and retreated as far as he could with safety, and that he killed his adversary of necessity to save his own life or his person from great bodily harm.

(Syllabus by the Court.)

*Appeal from District Court, Jefferson County;*
*Roy V. Hoffman, Assigned Judge.*

Charles Evans was convicted of manslaughter, and appeals. Affirmed.

The plaintiff in error, Charles Evans, hereinafter referred to as the defendant, was informed against for the murder of Bert Gibson, on the 2d day of May, 1910. Upon his trial the jury returned a verdict of manslaughter in the first degree and assessed his punishment at 18 years' imprisonment in the penitentiary. October 27, 1910, judgment was pronounced and entered in accordance with the verdict. From this judgment the defendant appealed by filing on April 17, 1911, in this court a petition in error with case-made.

The defendant admitted the killing, but claimed the same was done in his necessary self-defense. The salient facts which led to the killing were about as follows: Bert Gibson, the deceased, during the year 1910 was a tenant under the defendant on a farm in the northern part of Jefferson county. Between the tenant house, occupied by Gibson, and the defendant's house, was a pasture of about 50 acres. The defendant's stock, nine horses and four cows, ran in the pasture with Gibson's stock, a horse and a mule. A couple of months prior to the homicide they had some difficulty over the defendant's stock trespassing on Gibson, which resulted in one or two lawsuits. There was evidence that each party had made threats against the other, and the evidence discloses the fact that there was a very bitter feeling between them. On the morning of the tragedy the defendant put his hired man to work digging post holes for a fence to divide the pasture, and thereby separate the stock. Gibson ordered him to stop and gave him a note telling him to take it to the defendant, wherein he demanded that his part of the pasture should contain eight acres for each horse. The hired man returned with the defendant and his brother and the defendant's wife, and they commenced to build the fence. Gibson objected, and an altercation occurred. That afternoon after the fence was practically completed and without a gate for Gibson to take his stock out, Gibson took an axe and commenced chopping down the fence at a point about 75 yards from where the defendant, his wife, brother, and hired man were finishing the fence. Thereupon the defendant went to where Gibson was tearing down the fence, and after some words shot him through the body. Gibson ran a short distance and fell. Several of the neighbors appeared and carried him to his house, where he died about 7 o'clock that evening.

The main witness for the state was the widow of the deceased, who was present at the time he was shot. She says that when her husband began hacking the fence the defendant came running toward them and asked him what he was doing and commenced shooting at him and fired five shots. Her testimony taken from the transcript is in part as follows:

"Q. What did you do? A. I got between him and Mr. Evans. Q. How is that? A. I got between him and Mr. Evans —tried to keep him from shooting him. Q. To try to keep him from shooting him? A. Yes, sir; he jerked loose from me. The Court: Speak loud. A. As soon as ever he got loose from me he broke and run. Q. Did he have the ax in his hand? A. Yes, sir; he throwed it down. Q. Did he throw the axe down before Mr. Evans got to him? A. Yes, sir. Q. Throw the axe down and broke to run? A. Yes, sir. Q. Do you remember how many shots were fired? A. Yes, sir; five. Q. When he began shooting, what did you do? · A. Mr. Evans? Q. Yes, I say when Mr. Evans began shooting, what did you do? A. I got between him and Bert. Q. I mean after your husband ran? A. I ran after him."

Claud Best was a witness for the state and testified that he was working for Charles Evans, the defendant, and helped to build the fence, and was working on the fence when the shooting occurred; that they were 50 or 75 yards from where the deceased was knocking down the fence. His testimony taken from the transcript is in part as follows:

"Q When he went to knocking on the fence, what Did Mr. Evans do? A. He went down and told him to stop. Q. He went down and told him to stop? A. Several times. Q. Was Mrs. Gibson there? A. Yes, sir. Q. What did Mrs. Gibson do? A. She was just standing around there when he was knocking the fence. Q. I mean, what did Mrs. Gibson do when Evans went up and told him to stop? A. I did not see her do anything, only Mr. Evans pulled his gun, and she jumped in front of Bert and got him by the arm. Q. When Mr. Evans drew his gun, she jumped in front of Bert and got him by the arm? A. Commenced backing up when he throwed his gun. Q. Throwed his axe down? A. He ran backwards and then turned and went forwards. Q. What did Mr. Evans do? A. Why, he commenced shooting at him as soon as Mrs. Gibson got out of the way so he would not shoot her. Q. When Mrs. Gibson got out of the way, he went to shooting? A. Yes, sir. Q. Did Mr. Evans follow him? A. Mr. Evans followed him seven steps."

On cross-examination he stated:

"Q. What was Bert a-doing with the axe? A. Knocking down the fence. Q. Did Bert do anything else with the axe? A. He throwed it towards Charley. Q. When? A. When Charley pulled his gun. Q. Before Charley shot? A. Yes, sir. Q. What was Mrs. Gibson doing? Whose arm did she catch? A.

Bert. Q. What did Bert have in his hand when she caught him? A. I don't believe he had anything when she caught him. He had throwed the axe, and she ran in between Mr. Evans and Gibson then."

John McElroy, E. H. Lyons, Dick Cotton, James Lyons, and Allie Perkins testified that as a dying declaration the deceased said that:

"He was tearing down the fence to let his horses through, Mr. Evans had fenced his horses up, fenced his horses out; never left him any gate, and he was tearing down the fence to get his horses out, and Mr. Evans come up while he was taking them out and shot him."

Taylor Barber testified that about 10 days before the day of the homicide he heard the defendant say in the presence of his brother, Ed Evans, that he would run Gibson off or kill him; at that time he had a gun with him.

For the defense, Mrs. Annie Evans, wife of the defendant, testified that on the morning of the tragedy she went to Gibson's house and started their hired man to digging post holes for a fence to separate their stock from Gibson's stock; that shortly afterwards the boy came and said that Gibson had stopped him from building the fence; that her husband hauled out some posts, and she went with him; that Gibson met them and said the pasture was not big enough for his stock and called her husband a coward and everything but a gentleman; that Mr. Gibson grabbed her husband while he was in the wagon, and Mrs. Gibson grabbed hold of Mr. Gibson and dragged him off, and she and her husband returned to their home; that after dinner Mr. Evans and her brother and Claud Best, their hired man, and witness returned with the wagon and started to build the fence. The witness then testified as follows:

"Q. When in that day did you see Mr. Gibson again? A. Well, he come home just as we was a fixing the wire onto the first—setting the last post where it left the tree. Q. Which direction did he come from? A. He come from the northeast; he come up the east string of fence. Q. Came up the same fence you was building? A. He come up the string of fence and come inside and went right straight to the house, and then he come back down and told Mr. Evans he should not build the fence. Q. Go on and tell what happened between them. 'A.

We went on up to work, to tighten the wire to the last tree, and he walked up to us. Mr. Evans' brother was scaling a tree to tack the wire, and Mr. Gibson walked up close to him, and he says, 'It takes a devil of a lot of you people to build a fence.' Mr. Evans says, 'We are just going to put up the fence, that is all,' and he turned and went and sat by a log, and all of us started back down to the north to commence setting the posts again and tightening the wire. He got up and started. He said, 'I will see whether you will build a fence or not.' And the next time I seen him he was coming from the house with an axe and went down to the tree where the posts was setting there, and hit the wire, the best I could tell, on the south side of the trees where there wasn't any posts between us and the tree, and went on the other side of the tree and commenced hitting. Mr. Evans was pretty close down, and I heard him say something; seemed like he asked Mr. Gibson not to tear his fence down, and he went up, and Mr. Evans was right close to him, and he said something again. I was not close enough to hear what he said, and Mr. Gibson quit cutting on the fence and drawed the axe, and started towards Mr. Evans, and I saw Mr. Evans had his arm that way (indicating), and Mrs. Gibson sprung in and screamed, and Mr. Gibson drawed the axe and advanced on Mr. Evans, and at that time I heard the gun. Q. What else did you see A. And he shot right quick, and the next time why it kind of shocked me, and then when I realized what was going on I seen Mr. Evans was turning around, and Mr. Gibson was going the other way, and I went to Mr. Evans as quick as I could, and he says: 'Well, I am in trouble. What will I do?' I says, 'I guess you will have to go and give up, and let the law take its course,' and we went and got in the wagon."

Louis Harvill, called as a witness for the defendant, testified that he heard the deceased say: "I don't want to catch Mr. Evans up around my place anywhere. Me and him can't both live on the same place." That this was in March, after the trial over the cattle trespass, and that he went and told Mr. Evans what Gibson had said.

J. A. Fisher testified that the deceased told him "that he and Evans could not live on the same farm until fall; one or the other was liable to die before fall."

These were the only witnesses called by the defendant.

The defendant testified on his own behalf, and denied that he had threatened to take the life of Gibson, and stated that he

had been informed that Gibson had threatened to kill him, and for that reason he purchased a pistol about the time the deceased sued him for the trespass. He further testified, as taken from the transcript:

"Q. Well now, Mr. Evans, on the day of the trouble, when was the first time that you went over there near Mr. Gibson's premises that day? A. The 2d day of May. Q. I mean what time of day? A. About 11 o'clock. Q. What did you go over there for? A. Hauled a load of posts and distributed them along the ground where I was aiming to build the fence. Q. Did you see Mr. Gibson while he was over there? A. Yes, sir. Q. Did you have any talk with him? A. Yes, sir. Q. What was it? A. He told me I could not build it, and he come out there and jumped on me and blackguarded me and wanted me to come off, and put his hands up like that, and said, 'I would just like to slap your jaw.' He told me to come down in the woods with him away from the women folks and he would soon settle it. Q. Did you go? A. No. Q. Where was you when he was talking to you? A. In the wagon. Q. Just state what he did, if anything? A. Well, he grabbed me by the foot and tried to pull me out of the wagon, and he seen he could not do that, and he grabbed me by the hand and on the coat and tried to pull me out. Q. All right. What else? A. And he tried to grab the lines out of my hand and tried to pull over my team with me. Q. What did you do? A. I just set there in the wagon. Q. How did it end? A. And his wife jerked him back, and my wife pulled the lines out of his hands. Q. Where did you go? A. Me and my wife went right to the house. Q. Now, what time of day was this? A. Getting right at 12 o'clock. Q. Did you go back over there that day? A. Went back after dinner. Q. What did you go back to do? A. Build my fence. Q. Did you work on the fence? A. Yes, sir. Q. Without going into details, did Mr. Gibson come there that evening? A. He was gone when we went over there, and he come over towards Lyons northeast of where we was building the fence, come on and walked up to the house, so when we got there he was up there sitting on a log, and he said, 'It takes 'a devil of a lot of you fellows to build a fence,' and I told him I was just aiming to build a fence was all. Q. What did you do? A. I went to work and built my fence, and he went over to the house and got the axe and started to cut it down. Q. What did you do? A. And then I told him not to cut my fence down, and I walked down to where he was at, and I told him again, five or six times, and he

said: 'You sons of bitches! Get out of here. I will kill every last one of you.' And he come at me with his axe, and I drawed my gun. As he went to throw the axe, I fired it about the— Q. How many times did you shoot? A. Three, to the best of my knowledge. Q. How rapidly did you shoot him? A. Just as quick as possible. Q. Did you know where you hit him. A. I hadn't any more idea than a rabbit. Q. You don't know which shot hit him? A. No, sir. Q. Where did he go after you shot him? A. He started towards the house the last place I seen him. Q. Where did you go? A. I went to my wagon, went to meet my wife and went to the wagon. Q. Where did you go then? A. Home. Q. Did you see him any more? A. When I got up on the hill, I looked back and seen him laying in his wife's lap in the north pasture."

The cause was submitted at the June term of this court.

*Gilbert & Bond,* for plaintiff in error.

*Chas. West,* Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The defendant was convicted of the crime of manslaughter in the first degree and adjudged to suffer imprisonment in the penitentiary for a term of 18 years. He appeals from such judgment and from an order denying a motion for a new trial.

The first assignment of error relied upon to reverse the judgment is the refusal of the trial court to grant him a continuance of the case on the ground of absence of material witnesses.

The application, omitting the formal parts, is as follows:

"By the witnesses J. M. Robinson and Freeman Robinson, the defendant expects to prove that about three weeks before the time of the homicide that each of said witnesses heard the deceased say that he intended to make this defendant and his brother eat the dirt before the year was ended, thereby meaning that he would kill this defendant. That said testimony is material by reason of the fact that this and these and similar threats made against the defendant were communicated to this defendant prior to the time of the homicide, and at the time of the homicide the said deceased was making an attempt to carry said threats into execution. That the defendant attaches hereto and asks that the process showing service on said witnesses has been made for them to be here in court on this date and asks that

the same be made a part hereof. That the defendant believes the testimony of said witnesses is true. That he cannot procure it from any other source."

It appears that the application was based on the absence of witnesses who had been subpoenaed, but were not in attendance, and that an attachment, which, so far as the record shows, was not asked, would have been sufficient to secure their attendance, had it been asked. The defendant was entitled to have attachments issue to compel the attendance of these witnesses, and to have the trial postponed until the attachments were executed. He did not ask for attachments, and no reason is given for the nonattendance of any of these witnesses. If attachments had issued and proved unavailing on account of sickness, absence, or other sufficient reason, then a different question would be presented. The application is defective in failing to show where these witnesses reside, or any probability of procuring their attendance at some future time; and the court could not determine from the application that there was any more probability of their obeying a subpoena at the next term of court than at the present term. Applications for continuances are always addressed to the sound discretion of the trial court; and no rule is more firmly established in this state than that this court will not reverse a judgment of the trial court, upon the ground that it refused to grant a continuance, unless it appears that such court has manifestly abused its discretion in refusing it. *Lee v. State,* 7 Okla. Cr. 141, 122 Pac. 1111.

Clearly there was no error in refusing to grant the continuance.

Error is assigned upon the rulings of the court in admitting and excluding evidence. No useful purpose would be served in discussing these in detail. Suffice it to say that we have carefully examined them and are satisfied that no errors were committed prejudicial to the defendant.

The remaining assignments relate to the instructions given by the court. The record shows that, when the instructions were read to the jury, only a general exception was taken as follows: "The defendant then and there in open court excepted to each

and all and every one of the instructions." It appears from the record that the attorneys representing the defendant on this appeal became connected with the case after the conviction. On this general exception several of the instructions are complained of in their brief, and the instructions with reference to self-defense are criticised. Taking the evidence relied upon by the defendant to be true, we think that it was legally insufficient to show justification. This being so, the instructions considered as a whole were more favorable to the defendant than the law requires. The defendant was not conducting himself lawfully, and the necessity for taking the life of the deceased arose, if at all, by the unlawful acts of the defendant. He returned that afternoon to the premises in possession of the deceased with the evident intention of building the fence by overcoming whatever force the deceased might offer, and he went armed with a loaded pistol.

The threats testified to, and the altercation in the forenoon followed by fencing out the horses of the deceased, which no witness denies, and the defendant arming himself with a deadly weapon, and going to where the deceased was tearing down the fence, at least could be but a challenge to mutual mortal combat. And where the killing is done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death to one or the other of the combatants, the slayer cannot justify on the ground that it was committed in self-defense.

Says Mr. Wharton:

"If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self-defense. 'A man has not,' as is properly said by Breese, C. J., 'the right to provoke a quarrel and take advantage of it, and then justify the homicide.' Self-defense may be resorted to in order to repel force, but not to inflict vengeance. *'Non ad sumendam vindictam, sed ad propulsandam injuriam.'* There is certainly no law to justify the proposition that a man may be the assailant and bring on an attack and then claim exemption from the consequence of killing his adversary on the ground of self-defense. While a man may act safely on appearances, and is not bound to wait until a blow is received, yet he cannot be the aggressor and then shield himself

on the assumption that he was defending himself. 'And an adulterer caught in the act by the husband is guilty at least of manslaughter, if, in repelling a murderous attack by the husband, he kill the husband. But where the defendant, without an intent to take the deceased's life, provoke the quarrel, this while it destroys the excuse of self-defense, does not, if the deceased's attack put the defendant's life in danger, militate against reducing the offense to manslaughter." (1 Wharton's Crim. Law [10th Ed.] par. 485.)

Where the killing is done in mutual combat, it will be manslaughter at least, unless the survivor can prove that before the mortal stroke was given he had refused any further combat and had retreated as far as he could with safety, and that he killed his adversary from necessity, to save his own life, or his person from great bodily harm.

If the defendant acts from fear of death or great bodily harm, he must be free from fault in bringing on the difficulty. The defendant in this case by his own unlawful acts brought on the difficulty, and, if there was a hostile demonstration on the part of the deceased, it was the duty of the defendant to employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert the necessity of taking the life of his assailant. This is the law, and it is so stated in the instructions given. If we consider the matter in the most favorable aspect for the defendant, he is upon his own testimony guilty at least of manslaughter in the first degree.

The judgment of conviction is therefore affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.