## JOHN MOORE v. STATE.

No. A-3939.   Opinion Filed March 10, 1923.
Rehearing Denied Oct. 27, 1923.
(218 Pac. 1106.)

(Syllabus.)

1.   **Homicide—Assault with Intent to Kill—Elements of Crime.**
Under section 1756, Compiled Statutes 1921, defining certain
assaults with intent to kill, it is not necessary to prove the
elements of murder, but the charge is sustained if the defen-
dant would have been guilty of any grade of felonious hom-
icide had death ensued.

2.   **Same—When Design to Kill Presumed.**  Where one mutually
enters into a combat with another and in the course of the
conflict which ensues he assaults such other person with means
or force likely to produce death, the design to kill is presumed
and the conviction is justified under the statute.

3.   **Same—Conviction not Reversed Where Evidence of Accused
Shows He Was not Without Fault.**  Under section 2822, Com-
piled Statutes 1921, this court is not authorized to reverse a
judgment of conviction because of minor errors in the court's
charge, where the testimony of the defendant is such as to
show that he was not without fault in bringing on a combat
between himself and the prosecuting witness.

4.   **Instructions Sufficient.**  Instructions examined, and held suffi-
cient to cover the law of the case and not prejudicially erron-
eous.

Appeal from District Court, Cherokee County; A. C.
Brewster, Judge.

John Moore was convicted of an assault with intent to
kill, and he appeals.   Affirmed.

This is an appeal from a judgment of conviction against
the plaintiff in error, John Moore, hereinafter referred to
as defendant, rendered in the district court of Cherokee
county on the 16th day of September, 1920, wherein defend-
ant was charged with the crime of assault with intent to kill
one Henry Cannon, and his punishment fixed as above stated.

Defendant, John Moore, and his brother, Claude Moore,

were jointly charged with the offense, and, a severance having been requested by the defendants and granted by the court, John Moore was first tried.

The trouble between the defendant, John Moore, and the prosecuting witness, Henry Cannon, commonly called Jerry Cannon, occurred at the home of the witness Bob Thomas, who lived in the neighborhood of Cannon and about six or seven miles from where the Moores then lived, while a musical or dance was being given at the Thomas residence, and while the house was crowded with persons attending such dance.

It appears that the defendant, John Moore, and the prosecuting witness, Cannon, had had a previous difficulty, in which difficulty Cannon had called Moore a bowlegged s— of a b—, after which Moore instituted a prosecution against Cannon, and for which Cannon had been fined. This previous difficulty seems to have engendered considerable ill feeling between Moore and Cannon, which culminated in the trouble at the dance at Thomas' some two weeks later, out of which this prosecution arose.

There is considerable conflict between the testimony of the state's witnesses and that of the defendants. While several witnesses were called on behalf of the state in addition to the prosecuting witness, no one of them seems to have seen the actual beginning of this difficulty. On behalf of the defendant, it may be said that he is the only witness who pretends to have witnessed the beginning of this difficulty. The issues, therefore, on which the law of this case rests, were made out almost exclusively by the testimony, on the one hand, by the prosecuting witness, and, on the other hand, by that of this defendant. In view of the fact that this court is urged to reverse the judgment as to the defend-

ant, John Moore, solely because of the giving of erroneous instructions, it becomes apparent that so much of the testimony of these two witnesses as discloses the state's and defendant's respective theories should be incorporated in this statement. For that purpose, therefore, the following excerpts from the testimony of these two witnesses are deemed sufficient:

"Q. Now, standing where? A. Standing over there close to a bed and close to a dresser, and Heavy McDaniel wrote my name down to dance the next set, and I paid for that number—done had me a partner, and before I got her, before I got her number to dance, why John Moore jumped out in the floor and danced a little jig and said he was a fighting son of a bitch. Well, I never said nothing, nor he never said anything. He walked out of the door and got his brother Claude, and they came back in the house, and Claude had a rock in his hand and John had his knife open, standing by the door, and John says, 'Must I hit him?' and Claude reached him a rock and says, 'Beef him.' So he throwed the rock. I didn't know who he was going to throw it at, wasn't paying any attention to him much, and he throwed the rock and hit me. Q. Where did he hit you? A. Hit me right up there in the head. I just kind of sat back on the bed, and I got up, and we just met halfway of the room. I hooked my arm around his neck, and he throwed his arm over my back and commenced cutting me in the back. I throwed him on the bed, and when I throwed him on the bed he hollered for Claude then, and he was cutting me all the time with the knife. So Claude, he jumped on then, and went to beating me in the face, Claude did. So I just—I had an automatic just right under my coat, 32 Savage automatic, and I just pulled that out of my scabbard and shoved it down on him; thought that I had it right on him, but I didn't. The gun hung the first shot, never did shoot any more—never did shoot any more, so I got up off of the bed then, and we fought around and fought around there a long time over the house, around and around, and we finally ran over a bench and fell, and John Moore, he was on top, cutting me up with the knife

on the arms and on the back, and Claude, he cut me right over the eye there, a five-inch gash between here and the ear. Q. I will ask you whether or not he cut your ear in two there? A. No, just cut a little place through my ear there. He ran to the door then, and some of them started in there. Ellis Ketcher started in there, and Claude ran to the door and said: 'Don't any—any fellow come in here. I will shoot his brains out. I will shoot his brains out.' So they just went on cutting on me, just cutting me up. They twisted the gun out of my hand, and then they jumped up and ran out of the door. I got up and hunted my hat up and walked on out through the other room and came back around from the back way, and they was out on the front yard, and so they was standing there talking to Bob Thomas, telling him they was fighting sons of bitches. Sometimes they would run and sometimes they wouldn't run. They was fighting sons of bitches, and so I just went on out, got on my horse, and, bleeding right smart, went on out and got on my horse and rode off. Q. In how many places did they cut you, Henry, do you know? A. About 13 places; 13 places; 13 gashes. Q. Will you state what that is? A. This here is the coat I had on when we had the fight. Never has been changed a bit, just like it was, $37.50 suit; first time I had ever wore it.

"By Mr. Vance: We desire to offer this coat in evidence, state's Exhibit A. (There is here proferred a blue serge coat, which has much blood on it, and many cuts in the back and arms thereof, which is identified as state's Exhibit A.)

"Q. Henry, tell the jury as nearly as you can the different places where you were cut? A. Well, I was cut once about over the eye here (indicating), cut twice on the arm (indicating), and several gashes in my back there (indicating), and I was told there was about 8 gashes in my back, but some of them—they were just kind of scratches. There is just one pretty bad scar, about that long (indicating). They reached 8 inches. The doctor said the gashes reached 8 inches right down across my back here (indicating) and once right over my eye there (indicating). Q. Had you made any demonstration toward John or Claude Moore

that night to offer to do them hurt or violence in any way? A. Had not offered to bother them either one of them. Wasn't aiming to bother neither one of them. Q. Why did you have a gun with you? A. Well, I had this gun because John Moore said that he would get me—made his brags to me, says, 'I will get you.' I told him, 'Yeh,' I says, 'you will get me.' They have been in the habit of knocking fellows in the head with rocks and bottles all up there where they live.

"By Mr. Keenan: Well, that—

"A. Running their bluff around, so I didn't want them to hurt me, and I just put the gun on.

"By Mr. Vance: I believe you can take the witness."

On cross-examination:

"Q. You say he had a knife in his hand when he came in, open? A. In his right hand; yes, sir. Q. And you say that Claude handed him a rock and said, 'Beef him,' or something to that effect? A. 'Beef him.' Q. 'Beef him?' A. Yes, sir. Q. Did you see what he did with the knife? A. Kept the knife in his hand and throwed the rock and kept that knife in his hand too. Q. Did he throw the rock while he had the knife in his right hand? A. He throwed the rock—I believe he changed the knife in his left hand. Q. Now, are you sure he changed his knife from his right hand to his left hand? A. He throwed the rock with his right hand. Q. Where was the knife when he throwed the rock? A. In his left hand. Q. Now, you are sure he changed his knife from his right hand to his left hand? A. Yes, sir. Q. Then you had him around the neck and he was cutting you, was he? A. Cutting me right down across the back; yes, sir. Q. With his right hand? A. With his left hand. Q. With his left hand? A. I had him hooked around the neck with my right hand, and he was just kind of in behind me, and I just kind of— backwards in under me, and I just gave him a slam and throwed him over the bed. Q. How did you get hold of your gun? You had him with your right hand? A. When we got on the bed, I was fighting him, holding him there and fighting him. Q. Holding him with your right hand? A. Hold-

ing him with my left hand, beating him with the right fist. Q. I thought you said you had him by— A. When we went to the bed, I turned him loose with my right hand and got him with the left hand. Q. Where was the gun? A. Right on the right side, in the scabbard. Q. When did you think— A. When he called for Claude—I was aiming to whip him in a fair fight right there on the bed, and when he called for Claude I just thought, well, they just aim to do me up, so I will just get them first. Q. So you thought you would get them first, and then you got your gun? A. Yes, sir. Q. Where did you shoot? A. Well, I thought I had it right onto John, right in his stomach here (indicating), but I didn't. He was down on the bed, and I just reached in and got the gun and kind of pointed it out towards him, and thought I had it in his stomach here (indicating), and the gun hung. Q. Hung on the second shot? A. First shot. Q. Didn't shoot at all? A. Shot once. Q. Next shot, it hung? A. Yes, sir; shot once, and reversed back, and hung. Q. Did you hit him with the gun? A. No, sir; I didn't hit him with the gun until after we got up off the bed. Q. You did strike him with the gun then? A. Yes, sir; I hit him right up beside the head with it. Q. Didn't you hit him with the gun before you went down on the bed? A. No, sir; I didn't. Q. Didn't you have that gun in your hand when he threw that rock? A. I didn't. Q. Have your hand on your gun? A. I did not.

"John Moore.

"Q. What did he say to you? A. He came out of the gate— Well, you mean the first fuss? Q. Yes. A. He came out to the gate when me and the girl was passing there and invited me down to fight, and I asked him what about, and he said I had been lying on him, and I asked him what I had told, and he would not tell me. I told this Fowler girl to ride on out to the road and I would try to get him to tell me what she had told him, what he had heard; and she would not ride on, and said if I wanted to fight him she would stay there till it was over with. We rode off then, and after I got started off a little piece he said, 'You God damned, bowlegged son of a bitch, you cannot lie on me!'

I stopped my horse and turned him about halfway around, and I says, 'You big son of a bitch, you, I will see you again about that.' We went on then.  Q. When did you see him again after that?  A. At Bob Thomas' at a dance.  Q. At Bob Thomas'?  A. Yes, sir.  Q. Was he there when you went there?  A. I don't think he was.  I never saw him until after I had went out of the room they was dancing in into the other room.  I had been in that room before I went in there where we was dancing.  Q. What was he doing?  A. He was standing there looking around and seen me and made a step or two kinda towards me, and I went on out doors. He made as if he was going to jump on me, had his right hand in his right pocket.  Q. What did you do?  A. I went on out doors thinking I would go home.  After that I decided I would get me a rock and come back in and maybe he would not bother me any more.  When I went back in, he saw me and had his hat kinda pulled down and was looking out from under the brim at me, and he came walking towards me with his gun just about half out of his right coat pocket as if he was going to hit me or shoot me, and when I seen that gun I hit him with a rock.  Q. Then what happened?  A. Well, we went together.  He hit me with the gun right on the top of the head while I was getting my knife out.  Then we fell on the bed, and the gun went off while we was on the bed.  Q. Well, when did you get your knife out?  A. While we was on the floor before we fell on the bed.  Q. What kind of a knife was that?  A. A little single-bladed knife. Q. What became of it?  A. I lost it, that night.  Q. Then did you see it after that night?  A. No, sir; he clinched me around the neck with his left arm and was hitting at me with the gun, and I went to cutting at him under this way (indicating), coming under that way after we got up off the bed.  Q. Did you go there with the intention of fighting him? A. No, sir; I did not.  Q. How did you come to go to the dance? A. Well, I was in Hulburt, and Charley Freeman was there, and told us about the dance and wanted us to go, and me and my brother went with him.  Q. What became of the gun? A. My brother brought it up here and turned it over to you, he said; I don't know.  I was not here.  Q. Were you here

at the time of the preliminary? A. Yes, sir. Q. Do you know where the gun was at that time, don't you? A. You had it, you said. I don't believe that I saw it that I remember. Q. How many times did he hit you with the gun? A. Hit me one time. Q. Where did you go after the trouble? A. We went home. Q. Where did you go then? A. We started to Missouri. Q. What made you go to Missouri? A. I did not know what might happen, and I wanted to get away. I was kinda scared. Q. Kinda scared and went away. When did you come back? A. Came back in November, I think. Q. What did you do in Missouri? A. Made a crop. Q. Made a crop. Did you make any demonstration before Henry Cannon before the time that you claim he seemed to be coming toward you? A. No, sir. Q. You heard some witness testify that you danced a jig in there? A. Yes, sir; I did. Q. Did you make any demonstration of that kind to excite his attention. A. No, sir; I did not.

"Cross-examination:

"Q. Your feeling toward Cannon was pretty bitter, wasn't it, when you went there? A. Well, not so bad; I didn't like him a bit after he done like he did. I didn't aim to have any trouble with him unless he started it. Q. You were willing to fight him just any time he wanted to fight? A. I don't know; I was not that day. Q. How? A. I didn't want to fight him that first time. Q. I mean after that first day down there after he had give you this cursing you are talking about. You were willing to fight him then just any time he wanted to fight? A. I could not say. Q. How? A. I don't know whether I was or not. Q. Well, you know how you were feeling toward him; that is what the jury wants to know, how you were feeling towards Cannon after he gave you that cursing down there. A. I didn't like him. Q. Anybody invite you over there? A. Well, they never that night, only what Charley Freeman asked us to go with him. Q. You had been in there in the side room dancing, had you? A. No, sir; I had been in there watching them dance. Q. You had not danced any? A. No, sir. Q. When did you first find out that Cannon was there? A.

After I went in from the side room into the front room, after they started to dance. Q. What was it he did? A. Why he had his hand in his right coat pocket and commenced walking over towards me as though he made to jump on me and hit me. Q. How far away from him were you? A. I was not very far; about as far as to that white hat (indicating). Q. You went out there and got you a rock, did you not? A. I got a rock. Q. Where was Claude at that time? A. I don't know where he was; in the house, I suppose, somewhere. Q. Then you went back? A. Yes, sir. Q. Where did you get your rock? A. Out there in the yard. Q. How far away from the house? A. Not very far. Q. How many rocks did you get? A. Got one. Q. Pretty good one? A. Yes, pretty good rock. Q. You mean you just went out of the room once from the time you first saw him until the time you had the fight? A. Yes, sir; the one time. Q. Bent on having a fight with him when you found out he was there? A. I was if he jumped on me or acted like he was going to raise any trouble, after I got my rock and went back in there I figured on if I had to I was going to do the best I could. Q. You knew he had paid a fine for cursing you before? A. I did not know he had; I heard something about it; I did not know how true it was. Q. You knew you filed a complaint against him? A. I told you I did not care whether you made him pay a fine or not. Q. You also said he wasn't going to do you that way any more? A. Yes, sir; I did. I told him I didn't want him to do that way any more. Q. You know as a matter of fact you did file a complaint against him, did not you? A. Yes, didn't I tell you I did not care what you done about it? Q. Yes; you talked about like you would just as soon fight with him as law it out with him; I admit that. The truth is when you found out he was there you were going to have a fight with him? A. I know if he jumped on me we would; I wasn't going to bother him unless he bothered me. Q. You went in there and hit him with this rock? A. Yes, I hit him with the rock. Q. And you went to him? A. We both went to one another. Q. Where was this gun then? A. He had it in his hand. Q. Did he put it back in his pocket? A. He had it in his hand with about half of the barrel in his right coat pocket.

When I seen that, I hit him with the rock, and when we went together, he hit me with the gun. Then I got .my knife. About that time we fell on the bed. Q. He just hit you once before you could get your knife? A. Just hit me one lick. Q. You never did holler for Claude? A. No, sir. Q. Claude never did come to you? A. I guess he did; he was there when I fell over the bench in the floor; had his arm— Q. What made you quit fighting? A. Because I seen Claude had the gun. Q. Did not some fellow tell you to quit? A. Thompson Ticker told me to quit; I had done quit when he said that. Q. What did Jerry do when you quit? A. He was laying there hollowing. Q. You just cut him any place you could cut him, did not you? A. I did before he fell over the bench. I never hit him another lick after we fell over the bench. I never hit him another lick after we fell over the bench. After Claude had the gun, I did not hit him another lick. Q. Did Claude tell those fellows, 'The first son of a bitch stuck his head in there he would shoot it off'? A. I don't know whether he did or not. Q. You got out and went home and stayed about 20 minutes? A. Something like that. Q. Did you go to Missouri on a visit, too? A. No, sir. Q. What did you go for? A. I went because I was kinda scared. Q. Afraid of Cannon or afraid of the law? A. Well, afraid of both. Q. You never saw the day you was afraid of Cannon, did you? A. I did not want to fight him that day we came by there from the pasture. Q. Was you afraid to? A. I was kinda afraid to when I thought about what you told me. Q. Never been afraid to fight him since then? A. I was not afraid to that night. Q. What was it I told you? A. Told me if anybody raised a racket with me to go off and leave them and you would see into it. Q. What was the occasion of my telling you that? A. Because I was up there and made him pay a fine, I guess. I had heard about Jerry Cannon running his brother off from home with the shotgun. Q. That did not make you afraid of him that night down there at the dance? A. I just figured I would just as leave fight him that night; I wasn't very much afraid of him. Q. Just make that statement again. A. I said I had heard about him running his brother off from home with the shotgun. Q. That

last statement you made, you figured out some way— A. I just figured out I would just as leave fight him that night as any other time; I would have to some time, I guessed.''

Bruce L. Keenan, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating facts as above). This prosecution is based on that portion of section 1756, Compiled Statutes 1921, which reads as follows:

''Any person who intentionally and wrongfully * * * commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death, * * * is punishable by imprisonment in the penitentiary not exceeding ten years.''

To sustain a charge under such statute it is not necessary to prove the elements of murder, but the charge is sustained if the defendant would have been guilty of any grade of felonious homicide had death ensued. Such is the construction given by this court to a statute similar in terms. Tyner v. U. S., 2 Okla. Cr. 689, 103 Pac. 1057.

The foregoing observation is made because of comments contained in the brief of counsel for defendant against certain of the trial court's instructions which lead this court to believe that it was the contention of defendant's counsel that, before a conviction under the foregoing statute should be allowed to stand, the evidence against the defendant should be such as to have warranted his conviction of murder had death resulted. We do not so understand the statute.

The instructions given and complained of are as follows:

''In this case, the defendant, John Moore, as his plea and for his defense, says that the striking, assaulting, cut-

ting, bruising, and beating of the prosecuting witness was justifiable, and that in doing so he was acting in his own necessary self-defense. The law gives to every person the right to fight in self-defense, to protect himself from the unlawful attack of his adversary, and where a person is unlawfully attacked he is not required to retreat, but has a right to stand his ground and use whatever force is necessary to repel the attack, in order to prevent great bodily injury to himself. The law of self-defense was given to the citizen for his protection, but it cannot be pleaded as a defense by one who himself is the aggressor, or who enters voluntarily into a difficulty armed with a deadly or dangerous weapon, no matter in how much danger he may be placed in the course of the difficulty, nor how imminent his peril may become.

"You are instructed that if you find from the evidence in this case that the defendant left the room or house and armed himself with a dangerous and deadly weapon, to wit, with rock or knife, or with rocks and knives, and that he returned to the place where the prosecuting witness was, and voluntarily entered into a fight with the prosecuting witness, and with such deadly weapon or weapons did strike and beat and bruise and cut the prosecuting witness, he would be guilty, and under such circumstances cannot plead the right of self-defense, unless it was shown that before the assaulting, beating, cutting, and bruising of the prosecuting witness the defendant had refused any further combat and had, in good faith, withdrawn, and sought to avoid further conflict; and that the cutting, bruising, striking, and beating was then done in necessary self-defense.

"You are instructed that if you find from the evidence in this case that the defendant left the room or house where the combat had already been begun, and then armed himself with a dangerous and deadly weapon, to wit, with a rock or a knife, or with a rock and knife, and that he returned to the place where the prosecuting witness was, and voluntarily entered into a fight with the prosecuting witness, and with such deadly weapon or weapons he struck, beat, bruised, and cut

the prosecuting witness, he would be guilty under such circumstances and cannot plead the right of self-defense; unless it was shown that before the assaulting, cutting, beating, and bruising of the prosecuting witness the defendant was not at fault in any further combat, and only used such force as was necessary in such combat with the prosecuting witness.''

It is urged that the first of the foregoing instructions is erroneous for the following reasons:

(1) ''It does not tell the jury clearly that if they are satisfied from the evidence beyond a reasonable doubt that defendant sought, provoked, or occasioned the difficulty with the prosecuting witness, or they so find that he was the aggressor and voluntarily entered into the difficulty armed with a deadly or dangerous weapon with the intention of killing him or inflicting serious bodily harm upon him, that only then would he be deprived of the right of self-defense.''

(2) ''It authorizes the jury to assume that the defendant was the aggressor, or that he voluntarily entered into the difficulty armed, and that he could not plead self-defense unless it was shown (by the defendant) that before assaulting, beating, cutting, and bruising the prosecuting witness the defendant had refused any further combat and had in good faith withdrawn and sought to avoid further conflict. In other words, it 'tells the jury too plainly that the defendant cannot plead self-defense because he is one who is the aggressor.' ''

The theory of the state in this case, and there is evidence to support it, is that the defendant, John Moore, was the aggressor throughout the entire difficulty, and that everything done by the prosecuting witness, Cannon, was done in his apparently necessary self-defense.

We believe the testimony of the defendant, John Moore, does not entitle him to an acquittal. At most, his testimony shows a perfect willingness on his part to enter into a ''mutual combat'' with Cannon, and it is immaterial whether

Moore's intention was, at the time he entered such combat, to, with premeditated design, kill the said Cannon, or not, provided in the course of the conflict, which he had reasonable cause to believe would ensue, he assaulted said Cannon with such "means or force likely to produce death." In the latter event the design to kill is presumed and a conviction is justified under the statute.

Under the theory of the state that defendant was the aggressor and provoked the difficulty, the instruction was authorized, and under defendant's testimony it cannot be held to be prejudicially erroneous in this case because the intent with which he entered the difficulty becomes immaterial under the statute, as in either event had death resulted he would have been guilty of murder or manslaughter.

We do not construe section 2822, Compiled Statutes, 1921, to authorize this court to reverse judgments of conviction because of minor errors in the court's charge where the testimony of the defendant is such as in this case.

Further, under the following decisions, where the the law of "mutual combat" was presented by the evidence, the law of necessity to withdraw in good faith from the conflict is stated in language at least as forceful as that employed by the trial court in the instant case: Wood v. State, 3 Okla. Cr. 553, 107 Pac. 937; Boutcher v. State, 4 Okla. Cr. 576, 111 Pac. 1006; Evans v. State, 8 Okla. Cr. 78, 126 Pac. 586; Johns v. State, 8 Okla. Cr. 585, 129 Pac. 451; Moutry v. State, 9 Okla. Cr. 623, 132 Pac. 915.

The latter of the foregoing instructions complained of was given in the form requested by defendant's counsel, and it is here contended that the two instructions are misleading, confusing, contradictory, and prejudicially erroneous when considered together, and that the instructions when consid-

ered as a whole do not cure such apparent contradiction in the charge.

However true this may be, the conflict or contradiction arose because of defendant's requested charge. Without it there is no conflict, no contradictions in the general charge. This court has repeatedly held that a defendant will not be heard to complain of an error invited by him in the trial or occasioned by his own conduct or at his request. Allen v. State, 16 Okla. Cr. 136, 180 Pac. 564; Klein v. State, 15 Okla. Cr. 350, 176 Pac. 414; Carter v. State, 6 Okla. Cr. 232, 118 Pac. 264.

And further it has been held that where a conflicting instruction is given at the request of the defendant, the error occasioned is harmless, where the other instructions are sufficient. People v. Hower, 151 Cal. 638, 91 Pac. 507.

By what has been said in this opinion the court wants to be understood not to condone, or in any particular approve of, the conduct and demeanor of the prosecuting witness on the occasion of this difficulty. He was not entirely blameless, but that fact cannot operate to justify or excuse this defendant who entered willingly and voluntarily into a conflict, with one whom he had every reason to believe was armed, after having first armed himself with a heavy boulder and also a knife, both of which he used with telling effect upon his adversary. Defendant knew that such a conflict could end in none but serious results to one or the other of them, and himself stated, "I just figured I would just as leave fight him that night as any other time."

The judgment is affirmed.

DOYLE and BESSEY, JJ., concur.